STATE OF NEW JERSEY IN THE INTEREST OF D. G.,
A JUVENILE.

**Superior Court of New Jersey
Appellate Division**

Submitted May 5, 1980—Decided May 19, 1980.

244

Before Judges ALLCORN, MORGAN and FRANCIS.

*Cape-Atlantic Legal Services*, attorney for petitioner (*J. Paul Mohair* on the brief).

*John J. Degnan*, Attorney General of New Jersey, attorney for respondent New Jersey Division of Youth and Family Services (*Erminie L. Conley*, Assistant Attorney General, of counsel; *William H. Mild, III*, Deputy Attorney General, on the brief).

*Gould & Neidig*, attorneys for respondent Mental Health Services of Cape May County, Inc. (*George B. Neidig, Jr.* on the brief).

The opinion of the court was delivered by

MORGAN, J. A. D.

Petitioner, father of D. G., appeals from an order of the Juvenile and Domestic Relations Court denying his application for all records involved in the JINS (Juvenile in Need of Supervision) action pertaining to his daughter.

On March 27, 1979 a caseworker from the Division of Youth and Family Service (DYFS) filed a complaint pursuant to *N.J. S.A.* 2A:4–53(b) and 2A:4 45(b), alleging that petitioner's 15-year-old daughter, D. G., was a juvenile in need of supervision

(JINS) "in that she has left home on different dates without the permission of her parents."

On May 11, 1979 a hearing upon this complaint was held and D. G. was adjudged a JINS and placed on probation for one year subject to the condition that DYFS place her in a temporary foster home and that she receive counseling at respondent Mental Health Services of Cape May County, Inc. (hereinafter MHS).

On May 31, 1979 petitioner, by letter, requested the release to him of all records pertaining to D. G. This request was denied by MHS, DYFS and the JINS shelter.

On June 15, 1979 petitioner filed a notice of motion returnable June 26, 1979 seeking to obtain all of D. G.'s records pursuant to *N.J.S.A.* 2A:4–65(a)(3). At the June 26, 1979 hearing the judge heard argument (no sworn testimony was taken) from petitioner's counsel, MHS' counsel, MHS' director, JINS' shelter director and a DYFS caseworker. The Attorney General's office was present by a memorandum on this issue submitted prior to the June 26, 1979 hearing.

At the June 26, 1979 hearing, MHS' representative stated that extensive interviews were held with D. G., and that the interviewer believed it was not in D. G.'s best interest to have her parents see his notes of the interviews. Another of MHS' representatives stated that there was a "clear, implicit understanding between the juvenile and her therapist that the matters that they discussed . . . were privileged and this allowed her to speak in a free, unhindered way that she wouldn't have spoken in had she known there was a possibility what she was saying would be shared with her parents." In this regard MHS' representative also stated that if the possibility of returning the child to her home existed, some of what she said in the therapy sessions would have potential for harm.

The DYFS caseworker stated that DYFS encouraged D. G.'s parents to apply to respondent for counseling. They refused,

stating they wanted D. G.'s records and wanted to apply to Catholic Services for counseling. The DYFS caseworker then said that DYFS had recently checked with Catholic Services and no counseling with D. G.'s parents had been set up.

In response to the judge's question as to whether the records should be turned over if petitioner actually sought counseling from Catholic Services, the DYFS caseworker and MHS' representative indicated that they were concerned that D. G. had already established a relationship with MHS's therapists and that any decision in this regard should be made only after considering the consequences of switching therapy in midstream and in light of Catholic Services' limited staff.

Counsel for petitioner stated that D. G.'s parents were sincerely interested in D. G.'s welfare and they wanted access to the records for the insight they might provide concerning their daughter's problems. The parents were aware D. G. was having a problem but they didn't know what it was since their inquiries were being "stonewalled" and no one was telling them anything. Petitioner's counsel also stated that receipt of D. G.'s records by her parents "would provoke some insight to their daughter's insight and some of the patterns that are contributed [sic] to her 'problem.' "

On July 10, 1979 the judge denied petitioner's application for D. G.'s records. In his opinion he concluded that *N.J.S.A.* 2A:4–65(a)(3), the statute pursuant to which petitioner made his application, does not apply to the records of DYFS or MHS since they were neither court records, probation department records or law enforcement agency records. As to petitioner's second theory for receipt of D. G.'s records, the judge noted that although *R.* 5:10–7 does facially seem to authorize the availability of a juvenile's records to his or her parents on a confidential basis and without court order, some judicial discretion was implied into that rule as it had been implied in the cognate statute by *State v. Allen*, 70 *N.J.* 474 (1976). The judge interpreted *R.* 5:10–7 as requiring the availability of a juvenile's

records to "designated persons without order for use in conjunction with the treatment, care or other matters concerning the child's welfare." And finding that "at no time has it been indicated to this Court by the applicant that such information is needed in conjunction with any other matter concerning the child's welfare," the judge concluded that petitioner had shown no good reason or cause to receive this information because it is not in the child's best interest that petitioner have it.

This decision was converted into an order on August 2, 1979, and it is from this order that petitioner appeals.

■ Petitioner predicates his right of access to his daughter's records on a statute and a court rule, both provisions dealing with the circumstances in which a juvenile's record may or shall be disclosed. The statute, *N.J.S.A.* 2A:4 65, provides:

> a. Social, medical, psychological, legal and other *records of the court and probation department, and records of law enforcement agencies*, pertaining to juveniles charged under this act, shall be strictly safeguarded from public inspection. Such records *shall be made available only to* :
>
> (1) Any court or probation department;
>
> (2) The Attorney General or county prosecutor;
>
> (3) *The parents or guardian and to the attorney of the juvenile* ;
>
> (4) The Division of Youth and Family Services, if providing care or custody of the juvenile;
>
> (5) Any institution to which the juvenile is currently committed;
>
> (6) Any person or agency interested in a case or in the work of the agency keeping the records, by order of the court for good cause shown; and . . ..
> [Emphasis supplied]

Even facially, the statute has little application to this matter, because its concern is exclusively with court records, records of probation departments and law enforcement agencies. The records of MHS and DYFS are not court records belonging, in the case of MHS to a private, nonprofit corporation, and in the case of DYFS, to an administrative agency in the executive branch of government not properly regarded as having law enforcement or probation duties. Indeed, the only item petitioner seeks which would qualify as a court record is a report

prepared by DYFS at the court's request, which was filed with the court, thereby becoming a court record.

The court rule upon which petitioner also relies, *R.* 5:10–7, provides:

(a) Procedural Records. Procedural records include the docket, petitions, complaints, citations, summonses, orders, calendars, index cards, minutes, intake and referral forms, and transcripts of the verbatim record of any proceeding in the court.

(b) Social Records. Social records include all reports and correspondence pertaining to a person's social, familial, environmental, psychological, psychiatric, medical, educational, vocational, institutional, probation or parole history, background, examination, diagnosis, treatment or adjustment.

(c) *Availability.* All procedural and social records in juvenile matters and all social records in adult matters shall be strictly safeguarded from indiscriminate public inspection. The court may, in its discretion, in the best interest of a juvenile or adult or for other good cause, permit inspection of any procedural or social record, *except that procedural and social records shall be available on a confidential basis, without court order, to attorneys for the parties and in juvenile matters also to his parents,* guardian or custodians, to the chief probation officer and his assistants; to state and county correctional training schools and institutions, to the State Bureau of Children's Services for investigational, treatment or placement purposes; to justices and judges of the Supreme and Superior Court and the county and juvenile and domestic relations courts; and to the Governor of the State. Social records shall not be used as evidence during the trial or hearing of any person, except as otherwise permitted by these rules or the rules of evidence. [Emphasis supplied]

The same deficiency appears in petitioner's resort to this rule as made his reliance upon *N.J.S.A.* 2A:4 65 inappropriate—the rule's even more exclusive concern with court records. The rule's title is the first indication of its scope: "Classification and Availability of *Court Records.*" The second indication is in the realization that court rules only deal with that over which the court exercises power, court records. Clearly, the court cannot by court rule control disposition or even the circumstances in which disclosure will be made of records of administrative agencies not made subject to court control. Hence, all records in the custody of DYFS and those belonging to and under the control of MHS, the private corporation, remain as unaffected by the rule as they are by the cognate statute *N.J.S.A.* 2A:4 65.

■ Petitioner does not, however, fare any better with respect to any records of either DYFS or MHS which may have become court records by filing. *State v. Allen, supra,* teaches that *N.J.S.A.* 2A:4-65, although apparently conferring an absolute right to juvenile records to specified classes of persons, nevertheless invests the court with residual discretionary control over the disclosure of such records even to those favored classes. In *Allen* the prosecutor contended that *N.J.S.A.* 2A:4 65 gave him unfettered access to juvenile records. Although ultimately deciding in the prosecutor's favor, the court declined such a broad reading of the statute, reserving to itself the discretion to preclude disclosure in appropriate circumstances. Significantly, although *N.J.S.A.* 2A:4 -65 was amended after *Allen*, the Legislature failed to make any alterations to the prior enactment which would have expressed its dissatisfaction with the *Allen* ruling.

■ We read *R.* 5:10 -7 in *pari materia* with *N.J.S.A.* 2A:4 65. Both enactments share concern with the circumstances in which disclosure of juvenile court records may be made. Common sense and logic would be offended by our reading *R.* 5:10 -7 as withholding discretion from judges to control disclosure of juvenile records to specified classes of persons, while reading *N.J. S.A.* 2A:4–65 as we did in *State v. Allen, supra,* as investing those same judges with discretionary control over the very same records.

■ The need for some amount of discretion is manifest in this case. Underlying the provisions of both *N.J.S.A.* 2A:4 65 and *R.* 5:10–7 is the tacit assumption that the interests of parent and child in the juvenile matter generating the records are the same. Indeed, where the reverse is true, where a parent abuses or neglects a child, and court records are developed in the course of protecting the child from the parent, a different and clearly more restrictive rule of disclosure has been adopted. See *N.J. S.A.* 9:6–8.10a. Although this is not a case of child abuse or

neglect, what few records have been made available suggest hostility between D. G. and her father. The court was informed that D. G. was promised confidentiality in an effort to induce her to disclose information she might otherwise have felt obliged to conceal. In the absence of compelling reason, we reject the notion that the young woman's legitimate and induced expectations in the privacy of her communications to her psychotherapist should be violated or that statute or court rule command that result.

Affirmed.